UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

J.T.G.,

                                Petitioner,

        -against-

Kenneth GENALO, New York Field Office
Director for U.S. Immigration and Customs
Enforcement; Paul ARTETA, Director of the
Orange County Correctional Facility; Markwayne
MULLIN, Secretary of Homeland Security; Daren
K. MARGOLIN, Director, Executive Office for
Immigration Review; Todd BLANCHE, Acting
Attorney General of the United States,

                                Respondents.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  __6/15/2026__

26 Civ. 4521 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Petitioner, J.T.G., an asylum seeker from Colombia, petitions for a writ of habeas corpus under 28 U.S.C. § 2241, challenging the lawfulness of his detention by Immigration and Customs Enforcement ("ICE"). *See generally* Pet. (the "Petition"), ECF No. 1. J.T.G., a New York resident of over three years, contends that his Fifth Amendment right to due process was violated when he was arrested on April 23, 2026, near his home in Brooklyn, New York, and then detained at Orange County Jail. *See id.* ¶¶ 1–2. J.T.G. seeks immediate release from custody. *Id.* ¶ 3. For the reasons stated below, the Petition is GRANTED.

**BACKGROUND[1]**

J.T.G., a 33-year-old Colombian citizen, has lived in New York since 2022. Pet. ¶¶ 1, 15; Charles Decl. ¶ 3, ECF No. 13. On February 8, 2022, J.T.G. entered the United States through Arizona. Charles Decl. ¶ 4. There, he was encountered by U.S. Customs and Border Patrol ("CBP")

---

[1] Having reviewed the Petition and the government's opposition and accompanying exhibits, the Court finds that the Petition "present[s] only issues of law," and may, therefore, be adjudicated without a hearing. 28 U.S.C. § 2243 (commanding courts to dispose of habeas petitions expeditiously "as law and justice require").

officials, who served him with a Notice to Appear ("NTA") charging him as inadmissible and released him on his own recognizance.  *Id.* ¶¶ 4–5; NTA, ECF No. 14-4.

Following his release, J.T.G. moved to New York.  Pet. ¶ 18.  He applied for asylum, withholding of removal, and protection under the Convention Against Torture and has plans to seek lawful permanent resident status through his marriage.  *See* Pet. ¶¶ 19, 21.  Prior to his detention, J.T.G. lived with his wife and their children, including a newborn U.S. citizen daughter.  *Id.* ¶ 23.  He worked as a delivery driver for Instacart and was the sole provider for his family.  *Id.* ¶ 22.

Since entering the United States, J.T.G. has been arrested twice.  *Id.* ¶¶ 24–25.  All charges in relation to the first arrest, which occurred on September 17, 2022, were dismissed and sealed.  *Id.* ¶ 24.  The second arrest, which occurred on May 1, 2024, in New Jersey, resulted in charges of second-degree burglary under N.J. Stat. Ann. § 2C:18-2A, theft by unlawful taking under § 2C:20-3A, and criminal mischief under § 2C-17-3A.  *Id.* ¶ 25.  The charges were reduced, and J.T.G. pleaded guilty to criminal trespass and criminal mischief under §§ 2C:18-3A and 2C:17-3A, respectively.  *Id.*  On August 1, 2025, he was sentenced to five years' probation and directed to pay restitution.  *Id.*; *see also* RAP Sheet at 5, ECF No. 14-7.

Over eight months later, on April 23, 2026, ICE officers arrested J.T.G. near his home in Brooklyn.  *See* Pet. ¶ 27; Charles Decl. ¶ 15.  The parties dispute the circumstances surrounding J.T.G's arrest:  J.T.G. reports that the officers "threw [him] to the ground, causing him to hit his head and sustain a leg injury" for which he did not receive necessary medical attention, Pet. ¶ 27, but the government claims that J.T.G. "lost his balance and fell" and that "[m]ultiple ICE [o]fficers were able to apprehend [J.T.G.] without use of force," Charles Decl. ¶ 15.  After the arrest, ICE transported J.T.G. first to 26 Federal Plaza, and then to Orange County Jail, where he remains.  Pet. ¶ 28.

The government argues that on April 23, 2026, J.T.G. was detained pursuant to 8 U.S.C. § 1225(b)(2)(A), which provides for mandatory detention of certain noncitizens pending their

2

removal proceedings.  *See* Charles Decl. ¶¶ 17–19.  On April 28, 2026, however, the Second Circuit issued its decision in *Barbosa da Cunha v. Freden*, 175 F.4th 61, 69 (2d Cir. 2026), holding that mandatory detention under § 1225(b)(2)(A) does not apply to noncitizens like J.T.G., who have been residing in New York for multiple years.  *See* Pet. ¶ 1.   In light of *Barbosa da Cunha*, the government now seeks to justify J.T.G.'s detention under § 1226(a), *see* Gov't Ltr. ¶ a, ECF No. 10.

The government has submitted a "Notice of Custody Determination" form dated May 14, 2026, three weeks after J.T.G.'s initial detention and over two weeks after the Second Circuit's decision in *Barbosa da Cunha*.  A checked box on the form indicates that an ICE officer determined that J.T.G. should be detained pending a final administrative determination in his removal proceedings under § 236 of the Immigration and Nationality Act, 8 U.S.C. § 1226.  *See* Custody Det., ECF No. 14-9.  The form does not state why detention was warranted.  *Id.*  And neither the form nor the government states that J.T.G. was told the reason for his detention and afforded an opportunity to be heard.  The government argues that the form establishes that ICE made an individualized custody determination under § 1226(a).  *See* Charles Decl. ¶ 23; Opp. at 9, ECF No. 11.

## DISCUSSION

I.      <u>Request to Proceed Under a Pseudonym</u>

First, the government does not oppose J.T.G.'s request to proceed under a pseudonym.  *See* ECF No. 3; Gov't Ltr. ¶ f.

Generally, under Federal Rule of Civil Procedure 10(a), "[t]he title of [a] complaint must name all the parties."  This requirement "serves the vital purpose of facilitating public scrutiny of judicial proceedings and therefore cannot be set aside lightly."  *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 188–89 (2d Cir. 2008).  But courts have "carved out a limited number of exceptions to the general requirement of disclosure of the names of parties," where "the plaintiff's need for anonymity" may overcome "countervailing interests in full disclosure."  *Id.* at 189 (cleaned up).

"[W]hen determining whether a plaintiff may be allowed to maintain an action under a pseudonym, the plaintiff's interest in anonymity must be balanced against both the public interest in disclosure and any prejudice to the defendant." *Id*. To do so, the Second Circuit has explained that courts may consider the following "non-exhaustive" list of factors:

> (1) whether the litigation involves matters that are highly sensitive and of a personal nature . . . ;

> (2) whether identification poses a risk of retaliatory physical or mental harm to the party seeking to proceed anonymously or even more critically, to innocent non-parties . . . ;

> (3) whether identification presents other harms and the likely severity of those harms, . . . including whether the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity . . . ;

> (4) whether the plaintiff is particularly vulnerable to the possible harms of disclosure, . . . particularly in light of his age . . . ;

> (5) whether the suit is challenging the actions of the government or that of private parties . . . ;

> (6) whether the defendant is prejudiced by allowing the plaintiff to press his claims anonymously, whether the nature of that prejudice (if any) differs at any particular stage of the litigation, and whether any prejudice can be mitigated by the district court . . . ;

> (7) whether the plaintiff's identity has thus far been kept confidential . . . ;

> (8) whether the public's interest in the litigation is furthered by requiring the plaintiff to disclose his identity . . . ;

> (9) whether, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigants' identities . . .; and

> (10) whether there are any alternative mechanisms for protecting the confidentiality of the plaintiff.

*Id.* at 190 (cleaned up). "[A] district court is not required to list each of the factors or use any particular formulation as long as . . . the court balance[s] the interests at stake in reaching its conclusion." *Id.* at 191 n.4. A plaintiff seeking to proceed under a pseudonym must also base his allegations on more than just "mere speculation." *Doe v. Skyline Autos., Inc.*, 375 F. Supp. 3d 401, 405 (S.D.N.Y. 2019) (internal quotation marks and citation omitted).

Here, the factors set forth above weigh in favor of granting J.T.G.'s request. The underlying facts of this petition concern sensitive personal information relating to J.T.G.'s immigration proceedings and applications. J.T.G. has applied for asylum, withholding of removal, and protection under the Convention Against Torture. *See* ECF No. 4 at 2. Public disclosure of J.T.G.'s name and information could place him or his family in danger if he returns to Colombia. *See id.* at 4–5; *MM v. Mayorkas*, No. 24 Civ. 2090, 2024 WL 1795766, at *2 (S.D.N.Y. Apr. 25, 2024) ("Federal courts have permitted asylum seekers to proceed anonymously in federal court proceedings." (collecting cases)). Further, the public's interest in knowing J.T.G.'s identity is weak because the Petition concerns only issues of law. The government will not be prejudiced by J.T.G.'s anonymity because his identity has already been disclosed to the government, and the Court finds no other prejudice to the government by allowing J.T.G. to proceed under a pseudonym. *See generally* Gov't Ltr. Accordingly, J.T.G.'s request to proceed anonymously in this litigation is granted.

II.    Habeas Petition

"[T]he Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (citation omitted). "Noncitizens are . . . entitled to challenge through habeas corpus the legality of their ongoing detention," including "the lawfulness of detention when it is first imposed." *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020) (quotation omitted). "The Supreme Court has been unambiguous that executive detention orders,

5

which occur without the procedural protections required in courts of law, call for the most searching review." *Id.*  The Court holds that J.T.G.'s detention was unlawful from the outset, and his immediate release is, therefore, required.

The government admits that when it first detained J.T.G. on April 23, 2026, it attempted to do so pursuant to 8 U.S.C. § 1225(b)(2)(A), which provides for the mandatory detention of certain noncitizens.  *See* Charles Decl. ¶ 19.[2]  But, under Second Circuit precedent, this provision is inapplicable to noncitizens like J.T.G., "who are present in the United States after entering the country without inspection and admission, and who were not apprehended while entering the country or shortly thereafter."  *Barbosa da Cunha*, 175 F.4th at 69.  Rather, noncitizens like J.T.G. are subject to detention under § 1226(a).  *Id.*

To lawfully detain a noncitizen under § 1226(a), the government is required—at minimum—to exercise its discretion and make an individualized custody determination before detaining the person.  *See, e.g.*, *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 493–97 (S.D.N.Y. 2025).  But the government failed to do so here.  Rather, the record shows that on April 23, 2026, "ICE summarily detained [J.T.G.] without making an individualized determination as to his risk of flight or his danger to the community, let alone affording him notice or opportunity to be heard." *Cuy Comes v. DeLeon*, No. 25 Civ. 9283, 2025 WL 3206491, at *5 (S.D.N.Y. Nov. 14, 2025).  "There is no valid exercise of . . . discretion consistent with due process where 'there is nothing to suggest that [ICE] exercised any discretion *at all* in detaining [J.T.G.] . . . in contravention of the

---

[2] The government states that ICE exercised its discretion under § 1226(a) when it first detained J.T.G. by considering his arrest and conviction.  *See* Opp. at 16.  The Court does not credit this *post hoc* rationalization.  *See Rueda Torres v. Francis*, No. 25 Civ. 8408, 2025 WL 3168759, at *5 (S.D.N.Y. Nov. 13, 2025).  The government's assertion is directly contradicted by ICE Deportation Officer Michael Charles' declaration, which states that "Petitioner was previously detained pursuant to . . . 8 U.S.C. § 1225(b)(2)(A)" and provides that J.T.G. was arrested and detained because ICE confirmed he "does not have legal status to remain in the United States."  Charles Decl. ¶¶ 13, 19.  The government's position is further undermined by the years-long gap between the criminal conduct and ICE's arrest.  *See id.* ¶¶ 10–11, 15 (stating that ICE arrested J.T.G. nearly two years after J.T.G's May 2024 arrest in New Jersey and one year after he pleaded guilty to the reduced charges and was sentenced to probation).

basis procedural requirements of § 1226(a).'" *Id.* (quoting *Lopez Benitez*, 795 F. Supp. 3d at 495).

Therefore, J.T.G. was detained in violation of his constitutional due process rights.

The government argues that even if J.T.G.'s initial detention were unlawful, (1) any due

process violation has been cured by ICE's May 14, 2026 "individualized custody determination,"

and (2) the Court should require J.T.G. to exhaust his remedies through a bond hearing in

immigration court. *See* Opp. 11–16. The Court rejects both arguments.

First, any purported custody determination carried out on May 14—three weeks after

J.T.G.'s initial detention—does not undo the constitutional violation caused by J.T.G's initial

unlawful detention. As courts in this District have held, procedural due process requires that the

government exercise its discretion under § 1226(a) *prior* to detaining a noncitizen, and, therefore, a

belated custody determination does not remedy the constitutional violation. *See, e.g.*, *Chipantiza-

Sisalema v. Francis*, No. 25 Civ. 5528, 2025 WL 1927931, at *3 (S.D.N.Y. July 13, 2025)

(requiring, under § 1226(a) a "deliberative process prior to, or contemporaneous with, the

deprivation" (quoting *Lopez v. Sessions*, No. 18 Civ. 4189, 2018 WL 2932726, at *15 (S.D.N.Y.

June 12, 2018))); *Tumba v. Francis*, 813 F. Supp. 3d 394, 406–07 (S.D.N.Y. 2025) (holding that

the petitioner's "detention was illegal from the start" because the government must make an

"individualized assessment *before* detaining [the noncitizen]" (emphasis in original) (citation

omitted)); *Lopez Benitez*, 795 F. Supp. 3d at 494 (explaining that "it is clear that § 1226(a) requires

some exercise of discretion when determining whether or not to detain a noncitizen in the first

instance"); *J.M.P. v. Arteta*, 807 F. Supp. 3d 265, 295 (S.D.N.Y. 2025) ("[A]llowing a detainee to

be heard after the deprivation has already occurred does not satisfy due process." (citation

omitted)). Here, the ICE policy that led to J.T.G.'s initial detention is "defined by its systematic

denial" of any process. *Chipantiza-Sisalema*, 2025 WL 1927941, at *3. Because J.T.G.'s

detention was unlawful from the outset, the government cannot cure its procedural failures by

providing a custody determination three weeks later.  *See Inestroza Carbajal v. Frazier*, No. 26 Civ. 2778, 2026 WL 1309265, at *2 (E.D.N.Y. May 12, 2026).

Second, and in any case, the government's purported custody determination is procedurally deficient.  The government repeatedly claims that its May 14, 2026 Notice of Custody Determination form reflects an "individualized custody determination."  Charles Decl. ¶ 23; Opp. at 16.  But calling a form an "individualized custody determination" does not make it one.  The document merely states that an ICE officer, Joseph T. Pujol, decided that J.T.G. should be detained.  *See* Custody Det.  The form offers no reasons why Pujol revoked J.T.G.'s order of release and redetain him.  *See id.*  Nor does it show that Pujol's decision was made for a legitimate government purpose,[3] that it was based on individualized considerations,[4] or that Pujol communicated the reasons for his decision to J.T.G. and gave him an opportunity to respond.  *Id.*

Accordingly, the Court cannot conclude on this record that the government "engaged in any kind of exercise of discretion whatsoever with respect to [J.T.G.]."  *Lopez Benitez*, 795 F. Supp. 3d at 495.  Nor can the Court conclude that J.T.G. was provided with "notice . . . [and] an opportunity to be heard" regarding ICE's detention decision.  *Bercado Mercado v. Francis*, 811 F. Supp. 3d 487, 503–04 (S.D.N.Y. 2025); *Chipantiza-Sisalema*, 2025 WL 1927931, at *3; *Kelly v. Almodovar*, No. 25 Civ. 6448, 2025 WL 2381591, at *3 (S.D.N.Y. Aug. 15, 2025).  In sum, the record does not show that the government made an individualized custody determination under § 1226(a) at any point, let alone when he was first detained.  Because the government detained J.T.G. in violation of

---

[3] "Civil immigration detention must be 'nonpunitive in purpose' and bear a 'reasonable relation' to the authorized statutory purposes of preventing flight and danger to the community."  *Rodriguez-Acurio v. Almodovar*, 811 F. Supp. 3d 274, 317 (E.D.N.Y. 2025) (quoting *Zadvydas*, 533 U.S. at 690).

[4] For example, a *per se* determination of a risk of flight or danger to the community based on a noncitizen's undocumented status alone "comports not with [§] 1226(a), but with [the government's] desired policy of mandatory detention."  *Pastrana-Beltran v. Mullin*, No. 26 Civ. 2657, 2026 WL 1398609, at *2 (E.D.N.Y. May 19, 2026).

his constitutional rights, the appropriate remedy is release. *See Lopez Benitez*, 795 F. Supp. 3d at 496.

The Court excuses J.T.G. from exhausting his administrative remedies because the "available remedies provide no genuine opportunity for adequate relief" given the nature of the constitutional violation at issue—the failure to conduct an individualized assessment before detaining him—and because J.T.G. has raised "a substantial constitutional question" regarding his detention procedures. *Beharry v. Ashcroft*, 329 F. 3d 51, 62 (2d Cir. 2003); *see Chipantiza-Sisalema*, 2025 WL 1927931, at *3; *Cuy Comes*, 2025 WL 3206491, at *6; *Lopez Benitez*, 795 F. Supp. 3d at 496–97; *Tumba*, 813 F. Supp. 3d at 406; *Barco Mercado*, 811 F. Supp. 3d at 505.

## CONCLUSION

For the reasons stated above, J.T.G.'s Petition is GRANTED. The government is ordered to immediately release J.T.G. in accordance with this decision. The government shall notify J.T.G.'s counsel of where and when J.T.G. will be released.

The government must brief its authority, if any consistent with this Order, to (1) redetain J.T.G. without a valid exercise of discretion; (2) deny bond to J.T.G. in any subsequent proceeding on the ground that he must be detained pursuant to 8 U.S.C. § 1225(b)(2)(A); and (3) invoke the automatic stay provision at 8 C.F.R. § 1003.19(i)(2) if J.T.G. is granted bond in a subsequent proceeding. If, instead, the government confirms that it will take none of those steps with respect to J.T.G. without prior notice of at least one week provided to him and the Court, it need not file such briefing. *See Quispe-Sulcaray v. Noem et al.*, No. 25 Civ. 9908, 2025 WL 3501207, at *2 (S.D.N.Y. Dec. 7, 2025).

By **June 16, 2026 at 10:00 a.m.**, the government shall file a letter certifying compliance with

this order.  The Clerk of Court is respectfully directed to terminate the motion at ECF No. 3.

SO ORDERED.

Dated: June 15, 2026
New York, New York

_____
ANALISA TORRES
United States District Judge

10